Michael B. Baylous, ABA No. 0905022
LANE POWELL LLC
301 W. Northern Lights Blvd., Suite 301
Anchorage, Alaska 99503-2648
Telephone: 907-264-3303
Facsimile: 907-276-2631
Email: baylousb@lanepowell.com

Claire Loebs Davis, *pro hac vice pending*
Ann E. Prezyna, *pro hac vice pending*
LANE POWELL PC
1420 Fifth Avenue, Suite 4200
Seattle, WA 98101-2375
Telephone: 206-223-7000
Email: davisc@lanepowell.com
Email: prezynaa@lanepowell.com

Collette Adkins, *pro hac vice pending*
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 595
Circle Pines, MN 55014-0595
Telephone: 651-955-3821
Email: cadkins@biologicaldiversity.org

Emily Jeffers, *pro hac vice pending*
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
Telephone: 510-844-7109
Email: ejeffers@biologicaldiversity.org

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT ANCHORAGE

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br><br>Plaintiff,<br><br>v.<br><br>RYAN ZINKE, in his official capacity as Secretary of the United States Department of the Interior; and DEPARTMENT OF THE INTERIOR,<br><br>Defendants. | Case No. 3:17-cv-00091-JWS<br><br>**COMPLAINT FOR <u>DECLARATORY RELIEF</u>**<br>**(5 U.S.C. §§ 701-706)** |

## I. INTRODUCTION

1. Through this lawsuit, Plaintiff Center for Biological Diversity (the "Center") challenges the revocation, and seeks reinstatement, of a Defendant Department of the Interior ("Interior") rule that protects wolves, bears and other wildlife in national wildlife refuges in Alaska from cruel and ecologically harmful predator control practices, such as killing wolves and their pups in dens and gunning down grizzly bears at bait stations. *See* "Non-Subsistence Take of Wildlife, and Public Participation and Closure Procedures, on National Wildlife Refuges in Alaska," 81 Fed. Reg. 52,247 (August 5, 2016) (the "Refuges Rule"). The Center also challenges the revocation of, and seeks to preserve, Interior's authority to enact future rules to protect predators consistent with its statutory mandates to conserve natural diversity on Alaska wildlife refuges.

2. Pursuant to the 1996 Congressional Review Act (the "CRA"), 5 U.S.C. §§ 801-808, Congress recently passed a joint resolution, H.J. Res. 69, (the "Joint Resolution") that purports to nullify the Refuges Rule. By its terms, the CRA also bars any future rules in "substantially the same form" as the Refuges Rule, without amending any laws delegating rulemaking authority to Interior. 5 U.S.C. § 801(b)(2). This constraint on future rulemaking violates the separation of powers that must be maintained between the legislative and executive branches under the U.S. Constitution.

3. Through the National Wildlife Refuge System Improvement Act of 1997, 16 U.S.C. §§ 668dd-ee, and other authorities, Congress statutorily delegated to Interior rulemaking authority for managing the National Wildlife Refuge System and among other things, directed that Alaska refuges be managed to "conserve fish and wildlife populations and habitats in their natural diversity."

4. To constrain Interior's future rulemaking authority, Congress must amend those laws – using the constitutionally-mandated process of bicameralism and presentment. *INS v. Chadha*, 462 U.S. 919 (1983). By nullifying the Refuges Rule, and prohibiting any future substantially similar rules, 5 U.S.C. § 801(b)(2), without amending any of Interior's existing rulemaking authorities, Congress expanded its own power at the expense of the executive branch. Such Congressional overreaching undermines the separation of powers that must be maintained between the legislative and executive branches, in violation of the U.S. Constitution.

**Complaint for Declaratory Relief (5 U.S.C. §§ 701-706)**
*Center For Biological Diversity v. Ryan Zinke, et al.* (Case No. 3:17-cv-00091-JWS)          Page 2 of 15

Case 3:17-cv-00091-JWS   Document 1   Filed 04/20/17   Page 2 of 15

5. To realign the balance of power between the legislative and executive branches, the Court should declare that the CRA's prohibition on future rulemaking "in substantially the same form" as the Refuges Rule is an unconstitutional violation of the separation of powers. The Court should also reinstate the Refuges Rule, which Congress nullified through an unconstitutional application of the CRA.

6. The Court should also declare that any action (or inaction) by Interior based on the Joint Resolution is *ultra vires* because it is beyond the statutory authority conferred in the CRA.

## II. JURISDICTION

7. This Court has jurisdiction over the Center's claims pursuant to 28 U.S.C. § 1331 (federal question) and § 1346 (United States as a defendant).

8. Judicial review of agency action is provided by the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (the "APA").

9. The Court may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-02.

## III. VENUE

10. Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to the claim occurred in the District.

## IV. PARTIES

11. Plaintiff Center for Biological Diversity is a non-profit 501(c)(3) organization with over 48,500 active members, with offices in Anchorage, Alaska; the District of Columbia; Tucson, Arizona; Oakland, California; and elsewhere across the country. The Center and its members are concerned with the conservation of wildlife, including predators like wolves and bears, and the effective management of the National Wildlife Refuge System.

12. The Center has worked for over a decade to oppose ecologically-harmful predator control programs in Alaska and throughout the United States. The Center also has a long history of promoting sound state management of gray wolves, grizzly bears and black bears. The Center's work includes lawsuits, formal rulemaking petitions and other advocacy aimed at promoting conservation of these native carnivores and their habitats.

**Complaint for Declaratory Relief (5 U.S.C. §§ 701-706)**
*Center For Biological Diversity v. Ryan Zinke, et al.* **(Case No. 3:17-cv-00091-JWS)**         Page 3 of 15

Case 3:17-cv-00091-JWS   Document 1   Filed 04/20/17   Page 3 of 15

13. These efforts include submitting comments supportive of Interior's regulatory efforts to protect predators on federal lands in Alaska, including the Refuges Rule at issue here. For example, on March 28, 2016, a coalition of 74 organizations, including the Center, submitted comments supportive of the U.S. Fish and Wildlife Service ("FWS")'s proposed rule that led to the Refuges Rule, and thereafter, on April 7, 2016, the Center submitted separate additional comments supportive of the proposed rule.

14. Most recently, and in furtherance of its goal of protecting predators, the Center, along with a coalition of other wildlife conservation organizations, intervened in three ongoing cases brought by the State of Alaska and professional hunting organizations that challenge, among other things, the Refuges Rule. *State of Alaska v. Zinke, et al.*, No. 3:17-cv-00013-JWS (D. Alaska); *Safari Club Int'l v. Haugrud, et al.*, No. 3:17-00014-JWS (D. Alaska); *Alaska Prof'l Hunters Ass'n et al. v. U.S. Dep't of the Interior, et al.*, No. 3:17-00026-JWS (D. Alaska). These cases also challenge a rule promulgated by Interior in 2016 that specifically protects brown bears on the Kenai National Wildlife Refuge. "Refuge-Specific Regulations; Public Use; Kenai National Wildlife Refuge," 81 Fed. Reg. 27,030 (May 5, 2016).

15. Members of the Center seek out opportunities to study, observe and photograph wildlife (as well as their tracks and other signs) in national wildlife refuges in Alaska, including wolves, grizzly bears and black bears. Because of the unlawful nullification of the Refuges Rule and prohibition on substantially similar future rules, aggressive predator control practices authorized by Alaska's Board of Game may now occur on Alaska refuges. These practices will lead to fewer predators and reduced opportunities to encounter and otherwise enjoy such wildlife on Alaska refuges. This, in turn, injures the Center and its members' aesthetic, conservation, recreational, scientific, educational and wildlife preservation interests in observing and appreciating these animals in their natural environments on the refuges. These injuries would be redressed by the requested relief, through reinstatement of the Refuges Rule and a declaration that Interior has the authority to once again promulgate rules protecting predators on Alaska refuges consistent with its statutory mandates.

16. Defendant Ryan Zinke is the Secretary of the Interior. In that capacity, Zinke has supervisory responsibility over FWS, which is responsible for managing wildlife within national

**Complaint for Declaratory Relief (5 U.S.C. §§ 701-706)**
*Center For Biological Diversity v. Ryan Zinke, et al.* (Case No. 3:17-cv-00091-JWS)        Page 4 of 15

Case 3:17-cv-00091-JWS   Document 1   Filed 04/20/17   Page 4 of 15

wildlife refuges in Alaska and promulgated the Refuges Rule. Zinke is sued in his official capacity.

17. Defendant Department of Interior is a Cabinet-level executive agency that manages America's vast natural resources, including lands within the National Wildlife Refuge System in Alaska.

## V.  LEGAL BACKGROUND

**A.   Interior's Statutory Mandate to Manage the National Wildlife Refuge System**

18. Congress delegated to Interior the responsibility to manage the National Wildlife Refuge System through multiple statutes, including the Alaska National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. §§ 410hh-3233, 43 U.S.C. §§ 1602-1784, and the National Wildlife Administration Act of 1966 ("Administration Act"), as amended by the National Wildlife Refuge System Improvement Act of 1997 ("Improvement Act"), 16 U.S.C. §§ 668dd-ee.

19. The Improvement Act provides that the National Wildlife Refuge System "shall be administered by the Secretary [of Interior] through the United States Fish and Wildlife Service." 16 U.S.C. § 668dd(a)(1). The Improvement Act further provides that "the Secretary may temporarily suspend, allow, or initiate any activity in a refuge in the System if the Secretary determines it is necessary to protect the health and safety of the public or any fish or wildlife population." *Id*. § 668dd(k). The Improvement Act also provides: "In administering the System, the Secretary is authorized to take the following actions: . . . Issue regulations to carry out this Act." *Id*. § 668dd(b)(5). It further states, "In administering the System, the Secretary shall . . . ensure that the biological integrity, diversity, and environmental health of the System are maintained for the benefit of present and future generations of Americans." *Id*. § 668dd(a)(4).

20. ANILCA designated approximately 105 million acres of federal land in Alaska for protection of its resource values through permanent federal ownership and management, doubling the size of the National Wildlife Refuge System. S. Rep. No. 96-413, 126, 1980 U.S.C.C.A.N. 5070, 5071. Section 304(a) of ANILCA provides that "[e]ach refuge shall be administered by the Secretary . . . in accordance with the laws governing the administration of units of the National Wildlife Refuge System, and this Act."  Pub. L. No. 96-487, Tit. III, 94 Stat. 2371, 2384 (Dec. 2, 1980) (Title III of ANILCA is not codified). Under ANILCA, each

**Complaint for Declaratory Relief (5 U.S.C. §§ 701-706)**
*Center For Biological Diversity v. Ryan Zinke, et al.* **(Case No. 3:17-cv-00091-JWS)**          Page 5 of 15

Case 3:17-cv-00091-JWS   Document 1   Filed 04/20/17   Page 5 of 15

refuge in Alaska has a list of purposes for which it was established, including the first-listed purpose to "conserve fish and wildlife populations and habitats in their natural diversity."

B.  The Congressional Review Act

21. The CRA, 5 U.S.C. §§ 801-808, was enacted by Congress as section 251 of the Contract with America Advancement Act of 1996 (Pub. L. 104-121). Through the CRA, Congress sought to empower itself to review, by means of an expedited legislative process, new federal regulations issued by executive agencies and, by passage of a joint resolution, to nullify any such regulations and bar future similar regulations. *See generally* 5 U.S.C. §§ 801-808.

22. The CRA provides, with certain exceptions, that before a rule may take effect, the agency must submit a report on the rule to Congress. *Id*. § 801(a)(1)(A). Congress then has a limited window of time to disapprove of the regulation using the CRA's expedited procedures. *Id*. § 801(a)(3). One exception is a rule "that establishes, modifies, opens, closes, or conducts a regulatory program for a commercial, recreational, or subsistence activity related to hunting." *Id*. § 808. Such a rule does not require a report before it takes effect. Rather, it "take[s] effect at such time as the Federal agency promulgating the rule determines." *Id.* § 808.

23. Under Section 801(b)(2) of the CRA, once Congress repeals a rule, the executive branch is prohibited from promulgating any "new rule that is substantially the same as" the disapproved rule "unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule." *Id*. § 801(b)(2). In other words, Congress purported to give itself the authority to nullify an executive agency's exercise of its pre-existing statutory authority and to preclude the agency from exercising that statutory authority in the future – unless Congress, in subsequent legislation, reinstates the still-unchanged statutory language to the meaning that existed prior to the joint resolution.

C.  The Separation of Powers in the U.S. Constitution

24. Article I of the U.S. Constitution grants and delineates legislative power to Congress, which must consist of a Senate and a House of Representatives. U.S. Const., art. I, § 1. The Presentment Clause outlines federal legislative procedure by which bills become law, including the requirement for bicameralism and presentment to the President of the United States. U.S. Const., art. I, § 7.

**Complaint for Declaratory Relief (5 U.S.C. §§ 701-706)**
*Center For Biological Diversity v. Ryan Zinke, et al.* **(Case No. 3:17-cv-00091-JWS)**          Page 6 of 15

Case 3:17-cv-00091-JWS   Document 1   Filed 04/20/17   Page 6 of 15

25. Article II of the U.S. Constitution establishes the executive branch of the federal government, which carries out and enforces federal laws. It includes the President, the Vice President, the Cabinet, executive departments and agencies, such as Interior and FWS. *See* U.S. Const., art. II.

26. The Constitution's assignment of separate roles to the executive and legislative branches is part of the constitutional principle known as "separation of powers." Time and again, the U.S. Supreme Court has reaffirmed the importance of the separation of governmental powers between the legislative and executive branches. *See, e.g.*, *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252 (1991); *Bowsher v. Synar*, 478 U.S. 714 (1986); *INS v. Chadha*, 462 U.S. 919 (1983). As the U.S. Supreme Court stated in *Buckley v. Valeo*, the system of separated powers and checks and balances established in the Constitution was regarded by the Framers as "a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." 424 U.S. 1, 122 (1976).

27. To forestall the danger of encroachment beyond the legislative sphere, the Constitution requires that when Congress exercises its legislative power, it must follow the "single, finely wrought and exhaustively considered, procedures" specified in Article I, namely bicameralism and presentment. *Chadha*, 462 U.S. at 951; *see Metro. Wash. Airports Auth.*, 501 U.S. at 276 ("If the power is executive, the Constitution does not permit an agent of Congress to exercise it. If the power is legislative, Congress must exercise it in conformity with the bicameralism and presentment requirements of Art. I, § 7."). Congress violates the principle of separation of powers when it "unduly interfer[es] with the role of the Executive Branch." *Morrison v. Olson*, 487 U.S. 654, 693 (1988).

## VI.  FACTUAL BACKGROUND

### A.  Alaska Board of Game Approves Aggressive Predator Control Methods

28. The general practice of federal land managers, both in Alaska and the lower 48 states, is to permit state hunting regulations to apply on federal lands unless they conflict with federal laws and regulations. As such, despite having management authority over federally-owned lands, FWS and the National Park Service ("NPS") have long worked in close cooperation with the State of Alaska to manage wildlife and sport hunting within the National Wildlife Refuge System and National Preserves in Alaska.

**Complaint for Declaratory Relief (5 U.S.C. §§ 701-706)**
*Center For Biological Diversity v. Ryan Zinke, et al.* (Case No. 3:17-cv-00091-JWS)        Page 7 of 15

Case 3:17-cv-00091-JWS   Document 1   Filed 04/20/17   Page 7 of 15

29. A source of conflict between Alaska and FWS and NPS has been expansion of State-authorized hunting practices designed to reduce predator populations like wolves and bears below natural levels. Such liberalization of hunting practices has been driven by Alaska's "intensive management" law, as implemented by Alaska's Board of Game (the "Board").

30. The "intensive management" law, passed in 1994, requires the Board to use "intensive management" to maintain, for the benefit of hunters, populations of ungulate species, such as moose, deer and caribou, at unnaturally high levels set by the Board. AS 16.05.255(e), (g); *see* 5 AAC 92.106-.127. Even though intensive management can include a variety of different management options, such as habitat modification, AS 16.05.255(k)(4), the Board has relied almost exclusively on predator control based on outdated thinking that disregards the ecological importance of predators.

31. In the last decade, the Board has become increasingly aggressive in its efforts to reduce predators to increase the availability of moose, deer and caribou for hunters. Such predator control has included harvesting grizzly bears over bait; taking wolves and coyotes, including pups, during denning season; expanding season lengths and increasing bag limits; classifying black bears as both furbearers and big game that could allow for trapping and snaring of bears and sales of hides and skulls; and authorizing shooting bears from aircraft and same-day airborne hunting of bears at registered bait stations. Refuges Rule at 52,251 (citing 5 AAC 85).

**B. Under Its Statutory Mandates, the FWS Promulgates Regulations to Protect Predators on National Wildlife Refuges in Alaska**

32. FWS and NPS are legally required to manage the National Wildlife Refuge System and National Preserves to conserve natural diversity, as well as natural ecosystems and processes, which includes natural predator-prey relationships. 54 U.S.C. § 100101 (purpose of National Preserves); 16 U.S.C. § 668dd (purpose of National Wildlife Refuge System); Pub. L. No. 96–487, §§ 302-303 (1980) (purposes of refuges in Alaska).

33. As FWS explained:

> State regulations allowing activities on refuges in Alaska that are inconsistent with the conservation of fish and wildlife populations and their habitats in their natural diversity, or the maintenance of biological integrity, diversity, and environmental health, are in *direct conflict with our legal mandates* for administering refuges in Alaska under ANILCA, the Improvement Act, and the

**Complaint for Declaratory Relief (5 U.S.C. §§ 701-706)**
*Center For Biological Diversity v. Ryan Zinke, et al.* (Case No. 3:17-cv-00091-JWS)     Page 8 of 15

Case 3:17-cv-00091-JWS   Document 1   Filed 04/20/17   Page 8 of 15

> Wilderness Act, as well as with applicable agency policies (601 FW 3, 610 FW 2, and 605 FW 2).

Refuges Rule at 52,252 (emphasis added).

34. Because the Board's aggressive predator control efforts conflict with statutory mandates to conserve natural diversity on the National Wildlife Refuge System and National Preserves, FWS and NPS exercised their rulemaking authority for managing these federal lands by prohibiting certain Board-approved predator control on the federal lands within their jurisdictions.

35. Specifically, in 2015, NPS adopted regulations prohibiting several predator hunting practices on National Preserves in Alaska. 80 Fed. Reg. 64,325 (Oct. 23, 2015). And on January 8, 2016, FWS proposed similar regulations prohibiting many of the Board's authorized predator hunting practices on national wildlife refuges in Alaska. 81 Fed. Reg. 887. As noted above, the Center and others commented in support of FWS's proposed rule.

36. On August 5, 2016, FWS finalized the Refuges Rule. *See* 81 Fed. Reg. 52,247. Under the Refuges Rule, predator control is prohibited on Alaska refuges "unless it is determined necessary to meet refuge purposes, is consistent with Federal laws and policy, and is based on sound science in response to a conservation concern." 50 C.F.R. § 36.32(b).

37. The Refuges Rule specifically prohibits the following practices on national wildlife refuges in Alaska: (1) the hunting of bear cubs or sows with cubs (with an exception for customary and traditional use activities under state regulations); (2) taking grizzly bears over bait; (3) trapping and snaring bears; (4) hunting of wolves and coyotes during the denning season (from May 1 to August 9); and (5) shooting bears from aircraft and same-day airborne hunting of bears (other regulations already prohibit this for wolves and wolverines). Refuges Rule at 52,252; *see* 50 C.F.R. § 36.32. The regulations do not change Federal subsistence regulations or otherwise restrict the taking of fish or wildlife for subsistence by federally-qualified subsistence users. The regulations also do not restrict hunting or trapping outside of the refuges, and with the exception of the banned hunting practices listed above, state regulations continue to govern sport hunting and fishing on refuges.

**Complaint for Declaratory Relief (5 U.S.C. §§ 701-706)**
*Center For Biological Diversity v. Ryan Zinke, et al.* (Case No. 3:17-cv-00091-JWS)  Page 9 of 15

Case 3:17-cv-00091-JWS   Document 1   Filed 04/20/17   Page 9 of 15

## C. Congress Passes a Joint Resolution Nullifying the Refuges Rule and Purporting to Bar "Substantially" Similar Rulemaking by Interior

38. On February 7, 2017, the House introduced H.J. Res. 69 (the "Joint Resolution") to nullify the Refuges Rule. (NPS's rule protecting wildlife on National Preserves in Alaska is still in effect – and not at issue in this lawsuit – because the CRA's window for challenging that rule expired prior to the end of the Obama Administration.)

39. On February 16, 2017, the Joint Resolution passed the House on a 225 - 193 vote with just one hour of general debate (see H. Res. 123). Then, on March 21, 2017, without amendment, the Joint Resolution passed the Senate on a straight party-line vote of 52 - 47. The Joint Resolution provides:

> Providing for congressional disapproval under chapter 8 of title 5, United States Code, of the final rule of the Department of the Interior relating to "Non-Subsistence Take of Wildlife, and Public Participation and Closure Procedures, on National Wildlife Refuges in Alaska".
>
> Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That Congress disapproves the rule submitted by the Department of the Interior relating to 'Non-Subsistence Take of Wildlife, and Public Participation and Closure Procedures, on National Wildlife Refuges in Alaska' (81 Fed. Reg. 52,247 (August 5, 2016)), and such rule shall have no force or effect.

Pub. L. No. 115-20. After presentment on March 27, 2017, President Trump signed the Joint Resolution on April 3, 2017.

40. By passing the Joint Resolution through the authority of the CRA, Congress has purported to nullify the Refuges Rule and prohibit Interior from promulgating any rule "substantially the same" as the Refuges Rule. 5 U.S.C. § 801(b)(2). This is the case even though Congress has not amended – pursuant to the constitutionally-mandated safeguards of bicameralism and presentment – any of the underlying statutory mandates that lead to the Refuges Rule.

41. For decades, wildlife biologists and other experts at Interior have diligently and effectively managed the National Wildlife Refuge System consistent with the statutory responsibilities delegated to them by Congress. Now, because of the CRA's prohibition on rules substantially similar to the Refuges Rule, Interior has been unconstitutionally impaired from carrying out its statutory mandates to conserve predators on national wildlife refuges in Alaska.

**Complaint for Declaratory Relief (5 U.S.C. §§ 701-706)**
*Center For Biological Diversity v. Ryan Zinke, et al.* (Case No. 3:17-cv-00091-JWS)          Page 10 of 15

Case 3:17-cv-00091-JWS   Document 1   Filed 04/20/17   Page 10 of 15

42. Indeed, because the CRA gives no indication as to how Interior could discern what future rules would qualify as "substantially similar," the Joint Resolution creates a large and unconstitutional shadow effect, undermining Interior's rulemaking authority in violation of the separation of powers.

## VII. CLAIMS FOR RELIEF

### CLAIM ONE

**(Violation of the Separation of Powers of the U.S. Constitution)**

43. The Center hereby realleges and incorporates the preceding paragraphs.

44. With passage of the Joint Resolution, the CRA now bars Interior from any future rulemaking that is "substantially the same" as the nullified Refuges Rule. 5 U.S.C. § 801(b)(2). It thereby restricts Interior's rulemaking authority without amending – through bicameralism and presentment – any of the statutes that authorize Interior to manage national wildlife refuges in Alaska. The CRA's prohibition on future rulemaking "in substantially the same form" as the Refuges Rule therefore unconstitutionally infringes on the powers of the executive branch in violation of the separation of powers. *See INS v. Chadha*, 462 U.S. 919 (1983).

45. To the extent Interior has relied upon the Joint Resolution to revoke, refuse to implement or otherwise nullify the Refuges Rule and bar or otherwise refuse to promulgate any substantially similar rules, that decision is contrary to law in violation of the APA. 5 U.S.C. § 706(2).

### CLAIM TWO

**(Ultra Vires Revocation)**

46. The Center hereby realleges and incorporates the preceding paragraphs.

47. Section 801 of the CRA requires federal agencies to provide a formal report to Congress ("Congressional Report") on agency regulations before the regulations "can take effect." It states:

> Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing— (i) a copy of the rule; (ii) a concise general statement relating to the rule, including whether it is a major rule; and (iii) the proposed effective date of the rule.

5 U.S.C. § 801(a)(1)(A).

**Complaint for Declaratory Relief (5 U.S.C. §§ 701-706)**
*Center For Biological Diversity v. Ryan Zinke, et al.* **(Case No. 3:17-cv-00091-JWS)** Page 11 of 15

Case 3:17-cv-00091-JWS   Document 1   Filed 04/20/17   Page 11 of 15

48. Under Section 801, "major rules" "shall take effect" sixty days after the Congressional Report is received. *Id.* § 801(a)(3). Even for less significant regulations, the regulations "shall take effect" only after the Congressional Report is submitted. *Id.* § 801(a)(4).

49. However, Section 808 exempts certain regulations from the requirement that an agency submit a Congressional Report *before* regulations can take effect, providing:

> Notwithstanding section 801— (1) any rule that establishes, modifies, opens, closes, or conducts a regulatory program for a commercial, recreational, or subsistence activity related to hunting, fishing, or camping, or (2) any rule which an agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rule issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest, shall take effect at such time as the Federal agency promulgating the rule determines.

*Id.* § 808.

50. The CRA contains two mechanisms for Congressional disapproval of agency regulations, with differing scope. *Compare* 5 U.S.C. § 802 *with* § 801(d). The Section 802 process is available during the Congressional session the regulation was issued. The Section 801(d) process is available to a subsequent Congress.

51. Section 801(b)(1) provides that "[a] rule shall not take effect (or continue) if the Congress enacts a joint resolution of disapproval, described under Section 802, of the rule." *Id.* § 801(b)(1). Section 802 sets forth a Congressional disapproval process available during "a session of Congress." *Id* § 802(a). It allows a Congress to disapprove a regulation within sixty days after "the report referred to in section 801(a)(1)(A) [(*i.e.* the Congressional Report)] is received by Congress." *Id.*

52. To allow for a *new* session of Congress also to consider disapproving regulations issued during a *prior* session, the CRA also includes a separate review mechanism for certain rules. That section provides:

> In addition to the opportunity for review otherwise provided under this chapter [*i.e.*, the Section 802 disapproval process], in the case of any rule for which a report was submitted in accordance with subsection (a)(1)(A) during the period beginning on the date occurring (a) in the case of the Senate, 60 session days, or (B) in the case of the House of Representatives, 60 legislative days, before the date the Congress adjourns a session of Congress through the date on which the same or succeeding Congress first convenes its next session, section 802 shall apply to such rule in the succeeding session of Congress.

**Complaint for Declaratory Relief (5 U.S.C. §§ 701-706)**
*Center For Biological Diversity v. Ryan Zinke, et al.* (Case No. 3:17-cv-00091-JWS)          Page 12 of 15

Case 3:17-cv-00091-JWS   Document 1   Filed 04/20/17   Page 12 of 15

*Id.* § 801(d). In other words, if, within the last 60 session or legislative days of one Congressional session, an agency submits a Congressional Report required before newly issued regulations may take effect, the subsequent session of Congress has a renewed review period to consider disapproving those regulations. Under Section 801(d)(2), the sixty-day review period for such rules begins to run on the 15th day of the new Congressional session. *Id.* § 801(d)(2).

53. These two opportunities for Congress to disapprove agency regulations do not apply equally to all regulations. Disapproval under Section 802 (within a single session) is available broadly for all rules, and the provision only limits how *long* Congress may take before its review authority expires.

54. The opportunity for disapproval under Section 801(d) (for a subsequent session) is more constrained. In particular, it only applies "in the case of any rule for which a report was submitted *in accordance with subsection (a)(1)(A)* . . . ." *Id.* § 801(d)(1) (emphasis added). For that class of regulations, Section 801(d) authorizes review for sixty days in the new Congress.

55. Rules covered by Section 808 – which includes, *inter alia*, a rule "that establishes, modifies, opens, closes, or conducts a regulatory program for a commercial, recreational, or subsistence activity related to hunting" as well as a rule "for which an agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest" – do not require a Section 801(a) Congressional Report before they go into effect, but rather, as noted, "shall take effect at such time as the Federal agency promulgating the rule determines." *Id.* § 808.

56. Accordingly, for those regulations, there is no requirement for a Section 801 Congressional Report, because, by its terms, Section 801 only requires such a Report "[b]efore a rule can take effect," and, by operation of Section 808, these regulations take effect irrespective of a Section 801 Congressional Report.

57. Reading Sections 801(a), 801(d) and 808 together, it becomes clear the CRA does not permit Congressional disapproval of regulations that fall within Section 808 in a new session of Congress. Because a Congressional Report is not required for such regulations to go into effect, the submission of a Report on such a regulation is not "in accordance with" Section 801(a), but is done – if at all – entirely irrespective of any requirement in that provision.

**Complaint for Declaratory Relief (5 U.S.C. §§ 701-706)**
*Center For Biological Diversity v. Ryan Zinke, et al.* **(Case No. 3:17-cv-00091-JWS)**          Page 13 of 15

Case 3:17-cv-00091-JWS   Document 1   Filed 04/20/17   Page 13 of 15

58. The Refuges Rule is covered by the plain language of Section 808. Because it disallows certain hunting practices that may be approved by the Board, it is plainly a "rule that establishes, modifies, opens, closes, or conducts a regulatory program for a commercial, recreational, or subsistence activity related to hunting, fishing, or camping." *Id.* § 808.

59. Therefore, the Refuges Rule was not eligible for disapproval under Section 801(d)(1) in the new session of Congress. There was no Congressional Report submitted to Congress "in accordance with [Section 801] subsection (a)(1)(A)," which is necessary to trigger a renewed opportunity for review in a new Congress, because the Refuges Rule's effectiveness did not turn on the submission of such a Report.

60. Any reliance on the Joint Resolution by Interior is thus *ultra vires*, and beyond Interior's authority, and the Court should thus declare the Refuges Rule remains in effect. 5 U.S.C. § 706(2).

## VIII. PRAYER FOR RELIEF

THEREFORE, the Center respectfully requests that this Court:

1. Declare that the CRA's prohibition on future rulemaking "in substantially the same form" as the Refuges Rule, which Congress nullified through the Joint Resolution, is a violation of the separation of powers in the U.S. Constitution;

2. Declare that Interior's reliance on the Joint Resolution to revoke, refuse to implement or otherwise nullify the Refuges Rule and bar or otherwise refuse to promulgate any substantially similar rules is beyond its authority and contrary to law in violation of the APA. 5 U.S.C. § 706(2);

3. Declare the Refuges Rule, which Congress nullified through an unconstitutional and unlawful application of the CRA, reinstated;

4. Award the Center its reasonable fees, costs, and expenses, including attorneys' fees, associated with this litigation; and

5. Grant the Center such further and additional relief as the Court may deem just and proper.

**Complaint for Declaratory Relief (5 U.S.C. §§ 701-706)**
*Center For Biological Diversity v. Ryan Zinke, et al.* **(Case No. 3:17-cv-00091-JWS)**  Page 14 of 15

Case 3:17-cv-00091-JWS   Document 1   Filed 04/20/17   Page 14 of 15

DATED this 20th day of April, 2017.

        LANE POWELL LLC

        By  s/ Michael B. Baylous
           Michael B. Baylous, ABA No. 0905022
           Claire Loebs Davis, *pro hac vice pending*
           Ann E. Prezyna, *pro hac vice pending*

        CENTER FOR BIOLOGICAL DIVERSITY

        By  s/ Collette Adkins
           Collette Adkins, *pro hac vice pending*
           Emily Jeffers, *pro hac vice pending*

        Attorneys for Plaintiff

130799.0001/6934539.1

**Complaint for Declaratory Relief (5 U.S.C. §§ 701-706)**
*Center For Biological Diversity v. Ryan Zinke, et al.* **(Case No. 3:17-cv-00091-JWS)**         Page 15 of 15

Case 3:17-cv-00091-JWS    Document 1    Filed 04/20/17    Page 15 of 15